# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00514-CR

**Kyle Taylor, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 167TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-23-200257, THE HONORABLE DAYNA BLAZEY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Kyle Taylor appeals his terroristic-threat convictions on sufficiency grounds.  We affirm.

## BACKGROUND

Taylor's father called 911 to ask that someone check on his son—he gave his son's address in Lago Vista—because his son was threatening to kill himself and was live streaming this on Facebook.  Lago Vista Police Department Sergeant Jerome Brooks and Officer Robert Quick responded to check on Taylor's welfare.  They had already been out to check on Taylor a couple of times that same night, after other 911 calls, including by Taylor himself, his neighbor, and an off-duty officer.  Each time, they had found Taylor agitated and uncooperative, but unharmed, and had left the scene without incident.

When they responded to check on Taylor at his father's behest, Taylor brandished an object—which he said was a ".22"—inside a Crown Royal Bag, and he threatened to shoot the officers. Taylor was indicted on two counts of terroristic threat, one against each law enforcement officer. Each count carried a deadly weapon allegation.

At a jury trial, the State put on body-cam video of the officers' interaction with Taylor, and both officers testified that this was a mental-health call that turned dangerous. The jury found Taylor guilty of the two terroristic-threat counts but declined to make a deadly weapon finding in either case. The jury assessed punishment on each count at two years' confinement in state jail, found he had never been convicted of a felony, and recommended Taylor's sentence be suspended and Taylor be placed on community supervision. The trial court sentenced Taylor in each case to a term of two years but suspended the imposition of the sentence and placed him on community supervision for five years. Taylor appeals.

## ANALYSIS

### Sufficiency of the Evidence

Taylor argues the State failed to adequately prove his intent to place either Sergeant Brooks or Officer Quick "in fear of imminent serious bodily injury." Taylor points to the jury's finding that he did not have a firearm and the trial evidence suggesting that neither Sergeant Brooks nor Officer Quick thought he had a firearm.

### Standard of Review and Applicable Law

The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). In assessing the sufficiency of the evidence to support a criminal conviction, "we consider all the

evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

A person commits an offense of terroristic threat if he threatens to commit any offense involving violence to any person or property with intent to place any person in fear of imminent serious bodily injury. Tex. Pen. Code § 22.07(a)(2). An offense under Subsection (a)(2) is a state-jail felony if the offense is committed against a person the actor knows is a peace officer. *Id*. at § 22.07(c-1). The gravamen of the offense is the nature of the conduct, and the offense proscribes the conduct regardless of the result of the conduct. *Johnson v. State*, 710 S.W.3d 447, 455 (Tex. App.—Austin 2025, no pet.). The offense does not require that the victim or anyone else was literally placed in fear of imminent serious bodily injury or that the accused had the capability or intention to carry out the threat. *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. 1982). "All that is necessary to complete the offense is that the accused by his threat sought as a desired reaction to place a person in fear of imminent serious bodily injury." *Id*. at 306.

*Application*

As charged here, the State had the burden to prove, beyond a reasonable doubt, that Taylor—knowing Sergeant Brooks and Officer Quick were peace officers—threatened to commit aggravated assault to Sergeant Brooks and Officer Quick with intent to place them "in fear of

3

imminent serious bodily injury." Tex. Pen. Code § 22.07(a)(2), (c-1). Again, Taylor's complaint is that the State failed in its burden to adequately prove he had the requisite intent.

A person acts intentionally, or with intent, with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct. *Id.* § 6.03(a). The intent to put another in fear of imminent serious bodily injury can be inferred from the acts, words, and conduct of the accused. *Dues*, 634 S.W.2d at 305.

Here the officers' body-cam footage and testimony, considered as we must consider it—in the light most favorable to the verdict, support a determination that a rational juror could have found Taylor possessed the requisite intent beyond a reasonable doubt.

*Body Cam Footage*

The body-cam footage showed that, upon arrival, Sergeant Brooks stood off to the corner of the house, while Officer Quick knocked on the brightly illuminated side door and then stood off to the left side of that door. The door itself had a full-glass panel covered with closed miniblinds. Taylor could be heard inside, ranting and raving. Eventually, Taylor opened the miniblinds, closed them, then opened them again. He demanded, through the glass, to see the officers' badges up against the glass. He said something like, "If you don't identify yourself, I'll fucking shoot you through the fucking glass." Officer Quick asked him if he was live streaming, and Taylor responded, "Yep." Taylor simultaneously raised his right arm while holding an object in his right hand that was shrouded in a bag. He knocked it against the glass. Officer Quick asked him what it was, and Taylor responded, "It's a .22." Officer Quick and Sergeant Brooks nevertheless placed their badges against the door so Taylor could see them.

4

Taylor said something like, "My cat's fucking name is nig—; where's she at?" Sergeant Brooks asked Taylor if he needed them and Taylor responded, "No, dick." Taylor then aimed the object point blank at Sergeant Brooks and again knocked it against the glass, and said "get off my property." Sergeant Brooks ducked and both he and Officer Quick retreated from the door to the unilluminated corner of the house to take a covered position. Officer Quick commented that Taylor was trying to provoke them but said "there's no indication he's ever had a gun." Sergeant Brooks said, "I don't know what's in that bag."

About ten seconds later, Taylor came out of the front door, still wielding the object and yelled, "Get the fuck off my property." Both Sergeant Brooks and Officer Quick further retreated to the side of the house. Taylor continued yelling things like, "Whew, the .22 is the mostly deadly gun in America, bitch"; "Get the fuck off my property"; "I'll fucking shoot you"; "Get off my property you fucking nigg—"; "You didn't identify yourself for fucking shit"; "You killed my cat, my cat's fucking name is nigg—"; "Where the fuck is she?"; "I pulled it back, the hammer's back, motherfucker"; "Whew"; and, "I'm on Facebook." From the side of the house, Officer Quick repeatedly told Taylor to calm down. He also told Sergeant Brooks, "I can't tell if it's a gun or not. I can't tell."

The officers then walked away from the property. Taylor continued yelling and cussing and Officer Quick told him to calm down and that they were leaving. As they walked to their patrol vehicles, Officer Quick said to Sergeant Brooks, "We already know it's a bottle of Crown; ain't nothing in it." Taylor continued to whoop and holler and cuss in the background.

*Testimony*

Sergeant Brooks testified that, after he heard reference to a ".22," he went up to the door to check on Taylor's position. Taylor then pointed the object in the bag at his face and he ducked "to try to get out of the line of fire." Brooks testified that they retreated to the corner of the house to discuss what to do next.

> What happened next is after—well, as me and Officer Quick are trying to discuss our options on where to proceed from there, Mr. Taylor comes out of the house, and he comes out of the house very hostile, waving whatever it is in his hand, waving it around. And when he's doing this, you know, at one particular—one particular—one particular part, I believe, he actually pointed it towards my direction, which you saw that I had pulled my handgun, because at that particular point I don't know whether or not he actually has a .22, and he's putting me in fear. That's exactly what—I am—I'm there, and I'm thinking that I'm going to have to defend myself, but defend myself against what. Do you see my dilemma? I didn't know exactly what he was— he was holding in his hand.
>
> Ultimately [Taylor] went back into the house, and that's when I realized it's time to leave.

Sergeant Brooks also told the jury that he felt threatened with "imminent serious bodily injury"; because he had a good position of cover, he was willing for Taylor to shoot first; and he would not shoot "without being 100 percent" sure Taylor had a gun, and he was not that.

Sergeant Brooks also testified that they had to come out to the property yet again early the next morning because Taylor again called 911. But again, once they tried to help, Taylor responded with "[r]acial slurs, demanding for us not to come on his property, a lot of hostility."

Officer Quick testified that when Taylor told him he had a .22 and knocked it against the glass, it made the sound of "metal on glass," and "a pistol would definitely make the same noise on a glass window or any glass material." He also testified that when Taylor asked to see his badge, he put his badge up against "where the pistol was, where it was facing" so that "if

6

he had fired the weapon, it would have ricocheted off his badge." He too testified that because he could not see inside the bag Taylor held, there is no way he could have known for certain that Taylor had a gun.

According to Officer Quick they had two options, engage him, or "pull back and take away what was making him more angry, which in this case was our presence there[.]" Officer Quick thought Taylor might have been on something because of his "constant yelling, the rambling," his profuse sweating, and his wide-open, glossy eyes.

Both officers testified that they knew Taylor did not want Lago Vista PD out at his home, but said they had an obligation to respond to the 9-1-1 calls—including the ones made by Taylor himself. They were the only two on duty that night.

The jury also heard from Lago Vista PD Corporal Raymundo Villarreal. Villarreal testified that Taylor was arrested on outstanding warrants some four months later. Taylor had fled a traffic stop on foot, and, after a chase, he was apprehended in a grassy area. Villarreal later found, near that same grassy area, "a small black revolver .22 caliber on the ground."

*Taylor's Arguments*

Taylor complains that the evidence is insufficient to prove intent because no one thought he had a firearm. He points to the following:

- Even after Taylor said he had a .22, Sergeant Brooks calmly walked over to the door and showed Taylor his badge through the window, and Officer Quick, who was already at the window, did the same.

- After they retreated from the door, Officer Quick told Sergeant Brooks that there was no indication that Taylor has ever had a gun.

- As they walked away from the scene, Officer Quick told Sergeant Brooks, "We already know it's a bottle of Crown; ain't nothing in it."

Taylor argues that because the jury indicated by their verdict that they agreed with the officers that he did not have a firearm, there was no basis to find that anyone could have been placed in fear of imminent serious bodily injury.

First, a jury is entitled to deliver inconsistent verdicts. That does not change the sufficiency analysis on appeal. When measuring the sufficiency of the evidence, each count or finding must stand or fall on its own. *See Guthrie-Nail v. State*, 506 S.W.3d 1, 6 (Tex. Crim. App. 2015). For instance, a jury can answer a deadly-weapon special issue "no" even where the use of a deadly weapon is a necessary element of the offense the jury convicts on because "the law does not bar inconsistent verdicts." *Id*. (citing *United States v. Powell*, 469 U.S. 57, 68 (1984) and *Dunn v. United States*, 284 U.S. 390, 393 (1932)). That the verdict may have been the result of compromise or lenity or even mistake is possible; but such verdicts cannot be upset by speculation or inquiry into such matters. *Dunn*, 284 U.S. at 394. Thus, when analyzing the sufficiency of the evidence of a particular conviction in the face of inconsistent verdicts, we consider all the evidence admitted at trial under the *Jackson* standard. *Powell*, 469 U.S. at 67.

Second, the above-listed evidence, considered under the *Jackson* standard, supports the jury's conclusion that Taylor's conscious objective was to produce, through his conduct—his words and actions—fear of imminent serious bodily injury. *See Dues*, 634 S.W.2d at 306.

Taylor yelled things like, "It's a .22," "I'll fucking shoot you," and "I pulled it back, the hammer's back, motherfucker." And he did things like brandishing and pointing an object—obscured in a Crown Royal bag—that looked and sounded like it could be a gun. Although there was ample evidence that Sergeant Brooks and Officer Quick were unsure whether Taylor had a gun, that evidence is not fatal to the jury's rational conclusion about Taylor's intent. Again, the offense does not require that the State prove the officers were literally placed in fear of imminent

8

serious bodily injury; nor does it require the State prove that Taylor had the capability or intention to make good on his threats. *See id*. at 305. We overrule Taylor's complaint about the sufficiency of the evidence to prove intent.

## CONCLUSION

Having overruled Taylor's sole issue, we affirm the judgment of the trial court.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:  August 21, 2025

Do Not Publish

9